UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DEBORAH G. MATHIS,                        )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        No.  4:04CV806 DJS
                                          )                       (TIA)
JO ANNE B. BARNHART,                      )
COMMISSIONER OF SOCIAL SECURITY,          )
                                          )
                Defendant.                )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(c).

## Procedural History

On September 17, 2002, Plaintiff filed an application for Supplemental Security Income Benefits. (Tr. 218-221) She filed an application for Disability Insurance Benefits on October 11, 2002. (Tr. 63-65) Both applications were denied. (Tr. 19, 44-47, 214-217) On September 3, 2003, Plaintiff testified at a hearing before an Administrative Law Judge (ALJ). (Tr. 227-251) In a decision dated March 25, 2004, the ALJ determined that plaintiff was not disabled and was not entitled to a Period of Disability, Disability Insurance Benefits, or Supplemental Security Income. (Tr. 12-18) On May 24, 2004, the Appeals Council denied plaintiff's request for review. (Tr. 3-5) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the ALJ

At her hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff testified, along with a vocational expert (VE), J. Stephen Dolan. At the time of the hearing, plaintiff was 47 years old, measured 5 feet, 5 inches, and weighed 153 pounds. Plaintiff reported that she was married and lived with her husband. She completed the 10th grade and received her GED. Plaintiff last worked as a housekeeper, feeder aide at a nursing home, and laundry worker. She stopped working in July, 2002, after her friend took her to the hospital. Plaintiff testified that she injured her neck the month before when she picked up a bag of laundry. (Tr. 229-234)

Plaintiff stated that she had a cervical ruptured disc in her neck. She participated in physical therapy for treatment. The neurologist informed Plaintiff that surgery was not an option due to the severity of the rupture in her neck. Plaintiff stated that she previously worked as an assistant manager at a gas station, which allowed her to sit two or three hours in a day. Plaintiff did not believe she could perform a job where she would sit most of the day because she experienced pain in her neck and head after sitting. (Tr. 234-235)

Plaintiff testified that she did not drive. According to Plaintiff, her neurologist advised her not to drive because of the strain and pressure to her neck when she turned her head. Plaintiff stated that she was able to turn her head to the left but not to the right. With regard to daily activities, Plaintiff testified that she did the laundry with her husband's help. Plaintiff occasionally went to the grocery store. She cooked and hand-washed the dishes. Plaintiff stated that she smokes a pack-and-a- half of cigarettes a day. She was able to tie her shoes, and she opined that she could lift an carry three pounds. (Tr. 235-237)

Plaintiff described her pain as a pain in the back of her neck that went up her right arm and

shoulder. She did not file a worker's comp claim because the supervisor never got around to it and then claimed that the injury did not occur at work. On a scale of one to 10, Plaintiff stated that her pain was usually a seven-and-a-half and a 10 at its worst. Plaintiff testified that she had never been treated by a psychiatrist or psychologist and that she had not been hospitalized over the past five years for any condition. (Tr. 237-238)

Plaintiff further testified that she was involved in a car accident in 1994. She stated that she was pronounced dead three times and that she was in intensive care for back and leg injuries. Plaintiff reported that her current doctor was Dr. Myers and that he had been treating her for a year. Plaintiff began seeing Dr. Myers after Dr. Khardia advised her to find another doctor because there was nothing else he could do. (Tr. 239-240)

Plaintiff testified that she took medication for her pain. At the time of the hearing, Plaintiff took Vicodin and Fioricet. She reported side effects from the medication which included drowsiness, dizziness, and a spurt of energy. After taking Vicodin, Plaintiff could prepare meals and do the dishes. However, after she took the Fioricet, Plaintiff took a nap because the medication made her drowsy. Plaintiff stated that he experienced headaches daily, which lasted 30 minutes or longer. Plaintiff paced and cried when the headaches occurred. To relieve her neck pain, Plaintiff wore a neck brace and a neck massager. (Tr. 241-242)

Plaintiff opined that she could walk about a block or block-and-a-half. She could stand about 20 to 30 minutes before her back, legs, and neck began to hurt. She testified that she could not sit much longer and that she experienced the same symptoms when sitting. Plaintiff would then lie down with her neck brace or massager. She stated that she lay down two to three times daily for 30 minutes at a time because of the pain. Further, Plaintiff lay down three to four times a day due to the

medication side effects. Plaintiff saw Dr. Myers once a month. During the last visit, Dr. Myers checked Plaintiff's neck, refilled her medication, and prescribed a new medication. (Tr. 242-244)

Plaintiff testified that she had taken Elavil for depression. She reported that her moods changed since the injury. She experienced crying spells two or three times a day. Plaintiff stated that she cried because her life was not like it used to be. Plaintiff did not feel like doing anything. She got along with her husband, but she no longer liked being around people. (Tr. 244-245)

With regard to her pain, Plaintiff testified that some days were worse than others. On bad days, Plaintiff was unable to do anything because of the pain. She would pace and lie down to take naps. She also took more pain medication, which knocked her out but also reduced the pain so that she could do the dishes. Plaintiff opined that she experienced bad days two or three days a week. Plaintiff stated that she tried to stop smoking but that when she was around people, she became nervous and smoked more. (Tr. 245-247)

J. Stephen Dolan, a vocational expert (VE), also testified at the hearing. The ALJ posed three alternative hypothetical questions. The first one assumed a person with the age, education, and work experience of Plaintiff. She could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. She could sit, stand, or walk for six hours during an eight-hour day. She could only occasionally engage in postural activities and needed to avoid concentrated exposure to workplace hazards and vibration to the body. The second hypothetical was the same but for the need to sit/stand every 45 to 60 minutes. Under the third hypothetical, the ALJ added to hypothetical #1 the inability to sustain an eight-hour workday or demonstrate reliability in attendance or in adherence to a schedule. (Tr. 248)

In response to hypothetical #1, the VE answered that a person with those restrictions could

work as a cashier II as described in the Dictionary of Occupational Titles (DOT) and as it is normally performed, but not as the Plaintiff performed it. The same was true for a food sales clerk. With regard to hypothetical #2, the VE testified that Plaintiff could not perform her past work with the sit/stand option restriction. However, Plaintiff could perform work as a cashier in settings other than convenience stores. There were about 4,000 such jobs in the State of Missouri. The other settings included selling tickets and taking money at the end of a cafeteria line. Under hypothetical #3, all competitive work would be precluded. (Tr. 247-249)

The Plaintiff's attorney also questioned the VE, asking the VE to assume a claimant of the same age, education, and work background. In addition, the individual would need to lie down two or three times a day for 30 minutes at a time due to pain. Further, the attorney asked the VE to consider the side effects of medication. Under this hypothetical, Plaintiff would be unable to perform any work in the national economy. (Tr. 249-250)

## Medical Evidence

On July 9, 2002, plaintiff arrived at the Phelps County Regional Medical Center Emergency Room, complaining of a headache, nausea, dizziness, and blurred vision. The examining physician noted a dime-sized cyst behind Plaintiff's ear. An MRI revealed findings consistent with empty sella syndrome.[1] (Tr. 189-194, 197)

On July 18, 2002, Dr. Kharidi, a neurologist, examined Plaintiff for complaints of headaches. Plaintiff reported nausea, vomiting, neck pain, hand numbness, dizziness, blurred vision, and ringing

---

[1] "The pituitary gland is partly surrounded by a bony structure called the sella turcica ("Turkish saddle"). When the pituitary gland is not visible on CT or MRI scans of the sella turcica, the condition is referred to as empty sella syndrome. . . . Pituitary function is usually normal, and patients do not have any symptoms." National Institute of Health, Medline Plus, at http://www.nlm.nih.gov/medlinplus/ency/article/000349.htm.

in the ears.  Plaintiff also stated that she had pain in the back of her neck which shot to her head and pain in and around the ear and eye.  The neck and back exam revealed tenderness over the C-spine but no pain on straight leg raising.  Sensory exam revealed that light touch and superficial sensation were diminished on the right side in C6 distribution and superficial pain and temperature were diminished on the right side.  The examination was otherwise normal.  Dr. Kharidi diagnosed cervical radiculopathy[2] as well as cervicalgia.  He prescribed Indocin and Elavil and recommended further tests and the use of ultrasound and hot pack to the C-spine.  Dr. Kharidi also prescribed a soft cervical collar.  (Tr. 171-173)

Plaintiff attended several physical therapy sessions beginning July 18, 2002 and ending August 8, 2002, on which date her goals were met.  Plaintiff reported feeling much better as the treatment continued. (Tr. 177-188)  An MRI obtained on July 23, 2002 revealed degenerative changes at C5-6 with right central disc protrusion impinging on the thecal sac and right C5-6 neural foramen.  (Tr. 184)

Plaintiff returned to Dr. Kharidi on July 29, 2002.  Plaintiff reported that the medications and physical therapy were helping.  The neck and back exam revealed tenderness over the C-spine which was improved.  In addition, the diminished sensors on the right side in C6 distribution were stable.  Dr. Kharidi diagnosed cervicalgia and cervical radiculopathy.  He also noted that Plaintiff had right sided carpal tunnel syndrome.  Dr. Kharidi remarked that the medications were helping and encouraged Plaintiff to continue home-based physical therapy.  Dr. Kharidi prescribed Celebrex to

---

[2] Cervical Radiculopathy is a "condition in which part or all of the soft, gelatinous central portion of an intervertebral disk (the nucleus pulposus) is forced through a weakened part of the disk. This results in . . . neck pain and arm pain (cervical herniation) due to nerve root irritation." National Institute of Health, Medline Plus, at http://www.nlm.nih.gov/medlinplus/ency/article/000442.htm.

reduce the possibility of side effects and asked Plaintiff to continue wearing her cervical collar.  (Tr. 165-166)

On August 12, 2002, Plaintiff continued to complain of afternoon headaches but stated that they were less intense.  Plaintiff's neck pain was improved but still present.  The general examination revealed that Plaintiff was well developed, and well nourished.  She did not appear acutely ill.  The tenderness over the C-spine was improved, as were diminished light touch/superficial senses and superficial pain/temperature.  Dr. Kharidi diagnosed carpal tunnel syndrome, cervicalgia, and cervical radiculopathy.  He recommended that Plaintiff continue following his orders and return in 4 weeks.  He also discontinued the Celebrex because it caused stomach upset.  (Tr. 163-164)

On September 9, 2002, Plaintiff returned to Dr. Kharidi, complaining of continuous neck pain and headaches.  She reported that the pain was stable and that she experienced no side effects from Elavil.  Examination revealed improved tenderness over the C-spine, with no pain upon straight leg raising and limit or pain with neck flexion or extension.  Plaintiff showed improvement in her sensory exam.  Dr. Kharidi diagnosed carpal tunnel syndrome, cervicalgia, and cervical radiculopathy.  He prescribed Naprosyn, as Plaintiff's pain was stable.  Dr. Khardi further recommended that Plaintiff follow-up on 4 weeks for further adjustment of her medication.  (Tr. 161-162)

On September 26, 2002, Plaintiff was Dr. David Myers for a pinched nerve in her C-spine and a ruptured herniated disc.  Plaintiff reported that her medications caused stomach pain and nausea.  She requested a different medication.  (Tr. 175)

Dr. Kharidi examined Plaintiff on October 7, 2002, during which time Plaintiff reported that her neck pain was stable and Fioricet helped her pain.  Plaintiff's symptoms were unresolved but improved and stable. Dr. Kharidi advised Plaintiff to take Tylenol Arthritis every day and the Fioricet

as needed, along with Elavil. He recommended that Plaintiff follow up with her referring physician or as needed. (Tr. 159-160)

Plaintiff returned to Dr. Myers on a monthly basis between October 24, 2002 and June 17, 2003 for prescription refills. Plaintiff reported on January 22, 2003 that the Fioricet was no longer effective for migraines. (Tr. 146-149)

On December 13, 2002, Dr. Bobby Enkvetchakul conducted a medical examination of Plaintiff. Her subjective complaints included pain over the back of her neck and all over her head. She also reported numbness over her right arm from the elbow down, along with pain in the right shoulder. Plaintiff stated that she experienced dizzy spells lasting 5 to 10 minutes at a time. Her pain worsened as the day progressed. Plaintiff reported doing most of the housework with some help from her son and husband on heavier tasks. She did not drive, and stayed at home watching TV and reading. Dr. Enkvetchakul noted that Plaintiff suffered from borderline depression with no suicidal or homicidal ideation. (Tr. 151-152)

Physical examination revealed a well-developed, well-nourished female in no active distress and with no obvious deformity. Plaintiff ambulated normally and could rise up on her toes and rock on her heels. Range of motion of the spine was good, although Plaintiff complained of low back pain with all movement. Plaintiff's low lumbar region was tender to palpation with no muscle spasm noted. Waddell's testing was positive for axial loading, simulated rotation, and shoulder motion. Examination of the neck revealed diffuse tenderness to palpation from the base of the neck to the trapezius muscle bilaterally with no muscle spasm. Range of motion was limited, and Plaintiff moved slowly. Spurling's test was positive on the right, reproducing symptoms in the C6-C7 distribution. Plaintiff had subjectively decreased sensation in a glove stocking distribution in the right arm from

the elbow down with no atrophy. Biceps strength on the right was 5/5, but Plaintiff's grip strength was weaker on the right than on the left. Gross coordination was normal. At the end of the exam, Plaintiff became tearful, but it was not due to discomfort. (Tr. 152-153)

Dr. Enkvetchakul diagnosed neck and head pain, degenerative disc disease with disc protrusion at C5-C6, back pain, and MRI findings consistent with empty sella syndrome. He noted that Plaintiff's neck and pack pain was primarily mechanical in nature, with some evidence for a right-sided cervical radiculopathy. Dr. Enkvetchakul opined that Plaintiff could sit for indefinite periods of time with appropriate breaks to stretch and had not restrictions in standing. There was no strong evidence of limitations in carrying, lifting, or reaching, although Plaintiff self-limited her activities based on perceived discomfort. He did not recommend that Plaintiff lift more than 70 pounds, but he saw no reason that Plaintiff could not frequently lift 5 to 10 pounds. Dr. Enkvetchakul opined that Plaintiff should have no trouble handling objects, speaking, or hearing. (Tr. 153, 157-158)

On June 19, 2003, Dr. Myers completed a Medical Source Statement, noting that Plaintiff could frequently lift 5 pounds and occasionally lift 10 pounds. She could stand and/or walk a total of 1 hour, continuously for 30 minutes. In addition, Dr. Myers opined that Plaintiff could sit a total 2 hours, continuously for 30 minutes. Plaintiff's ability to push and/or pull was limited. She could only occasionally climb, balance, stoop, kneel, crouch, and bend. However, she had unlimited ability to reach, handle, finger, feel, see, hear, and speak. Dr. Myers included the environmental restrictions of avoiding machinery, temperature extremes, and vibration. He indicated that the limitations stemmed from degenerative disc disease of the c-spine. Dr. Myers further noted that his Statement included consideration of subjective complaints. He opined that rest would be helpful to Plaintiff, along with reclining for up to 30 minutes, 1-3 times daily; and assuming a supine position for up to

30 minutes, 1-3 times daily.

On October 24, 2003, Dr. Laura Brenner, Ph.D., performed a psychological evaluation of Plaintiff on behalf of Disability Determinations. Plaintiff described her health as "fine." She reported that her current health problems included asthma secondary to smoking and neck pain. She stated that she experienced a lifting injury at work in 2002, causing a ruptured disc in her neck. Plaintiff reported headaches and neck and back pain since that time. Plaintiff's medications included Zantac, Furoseds, Vicodin, Mobic, Elavil, an inhaler, and Clarinex. Plaintiff applied for mental services, but the staff informed her that Dysthymia did not allow her to qualify for services. (Tr. 132-133)

Plaintiff stated that her primary impediments to working were headaches and neck and back pain. In addition, she reported that her medications made her tired and affected her concentration. Plaintiff indicated that she slept and ate well, having adequate energy and enjoying a number of regular activities. She was able to concentrate, and her memory was good. Plaintiff worried about bills and infrequently experienced secondary anxiety. However, she denied panic attacks and did not allow her dislike for crowded, big stores to limit her functioning or ability to go places. She got along well with friends and family. Plaintiff further reported that she spent her day doing light housecleaning, watching TV, reading, and talking to friends. She felt better in the mornings and tried to complete tasks then and relax later. Plaintiff reported difficulty with vacuuming or lifting. She did the laundry, but her husband carried the clothes. Plaintiff did not drive, and her husband usually went to the store. She enjoyed watching her husband's band play, although pain and medication side effects made enjoyment difficult. (Tr. 134)

During the appointment, Plaintiff was pleasant and cooperative. Dr. Brenner estimated her intellect as low-average. Plaintiff's behavior was unremarkable, and she sat stiffly with no evidence

of discomfort during a lengthy evaluation. Personality Test Results overall suggested that Plaintiff reported multiple physical worries and complaints in excess of that typically seen in medically ill individuals. Dr. Brenner concluded that the personality test results were consistent with a somatoform diagnosis. Depression did not appear to significantly add to Plaintiff's distress. Dr. Brenner found no work restrictions or limitations from a psychological perspective. She recommended that Plaintiff continue her antidepressant medication and noted that test results would not preclude Plaintiff from managing her funds. (Tr. 136-141)

## The ALJ's Determination

In a decision dated March 25, 2004, the ALJ found that Plaintiff was insured for a Period of Disability and Disability Insurance Benefits throughout the period of the decision. Plaintiff had not engaged in substantial gainful activity since July 9, 2002, the alleged onset date. The ALJ further found that Plaintiff was more than minimally limited by discogenic and degenerative disorders at C5-6 and headaches, which satisfied the requirement for a severe impairment. However, Plaintiff's condition did not meet or medically equal one in the listings. The ALJ determined that Plaintiff's allegations were not credible, and that she had the residual functional capacity (RFC) to lift or carry twenty pounds occasionally and ten pounds frequently; sit six hours in an eight-hour workday; stand or walk six hours in an eight-hour workday with a required sit/stand option every forty-five to sixty minutes. Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. In addition, Plaintiff had to avoid exposure to workplace hazards and concentrated exposure to body vibration. The ALJ found that Plaintiff was unable to perform her past relevant work. However, given her age, education, and the vocational expert testimony, the ALJ determined that Plaintiff was able to perform work existing in significant numbers in the national economy. Thus, the ALJ concluded that Plaintiff

was not disabled and was not entitled to Social Security benefits. (Tr. 16-18)

Specifically, the ALJ noted Plaintiff's limitations from descogenic and degenerative disorders at C5-6, along with headaches. The ALJ dismissed Plaintiff's allegations of depression due to the lack of medical evidence corroborating this allegation. The ALJ noted that absence of a mental disorder diagnosis and psychiatric treatment. In addition, the ALJ mentioned Dr. Brenner's conclusion that Plaintiff did not have a mental disorder. (Tr. 12-13)

The ALJ found that Plaintiff's condition failed to meet or equal a listing. Therefore, the ALJ assessed Plaintiff's RFC. He determined that the medical record did not support the Plaintiff's allegations. The ALJ noted that an MRI of Plaintiff's cervical spine showed degenerative changes at C5-6 with right-sided disc protrusion that impinged on the thecal sac and right side of the C5-6 neural foramen. He further noted Dr. Kharidi's examinations indicating cervical radiculopathy, diminished sensory ability to light touch in C6 distribution, and diminished temperature in C6 distribution. However, the ALJ also found that Dr. Kharidi's examinations revealed that Plaintiff retained normal muscle mass, muscle strength, muscle tone, and upper extremity coordination. Dr. Kharidi's reports also showed that Plaintiff's symptoms improved, which was inconsistent with a finding of disability. (Tr. 14)

The ALJ also noted Dr. Enkvetchakul's entire consultative report, which concluded that Plaintiff had no limitations in handling objects, reaching, and standing or sitting with appropriate breaks. Dr. Enkvetchakul also opined that Plaintiff could lift or carry up to 70 pounds and up to 10 pounds frequently. With regard to Dr. Myers, the ALJ discussed Dr. Myers' conclusions that Plaintiff should avoid vibration and workplace hazards and that Plaintiff had no limitations in reaching, handling, fingering, or feeling and only occasional limitations in climbing, balancing, stooping,

kneeling, and crouching. However, the ALJ gave little weight to Dr. Myers' opinions regarding Plaintiff's ability to sit and stand and her need to recline on a daily basis. The ALJ noted the absence of supporting data other than the mention of degenerative disc disease of the cervical spine. The ALJ further noted that the treatment notes revealed no examinations or musculoskeletal deficits. Instead, the notes simply indicated that Dr. Myers simply refilled prescriptions. The ALJ determined that Dr. Myers' opinions were internally inconsistent and inconsistent with the record as whole. (Tr. 14-15)

The ALJ further assessed Plaintiff's credibility, finding that her daily activities were inconsistent with her asserted inability to walk more than a block and a half at a time or lift more than three pounds. The ALJ also noted that Plaintiff's medications were prescribed to relieve mild to moderate pain and that other treatments such as therapy and intermittent use of a cervical collar relieved pain. While Plaintiff complained that Fioricet no longer helped her headaches, the ALJ noted that Plaintiff did not discontinue its use, thus implying that the symptoms were not so intense or frequent to be disabling. The ALJ assessed Dr. Brenner's evaluation which indicated that Plaintiff was able to sit without apparent discomfort during a lengthy evaluation of Plaintiff. (Tr. 15-16)

The ALJ thus concluded that Plaintiff's allegations were not credible. He found that Plaintiff had the RFC to lift or carry twenty pounds occasionally and ten pounds frequently; sit six hours; stand or walk six hours with a sit/stand option every forty-five to sixty minutes; occasionally climb, balance, stoop, kneel, crouch, and crawl; and avoid exposure to workplace hazards and concentrated exposure to body vibration. The ALJ stated that there was a wide range of light work defined by the regulations. However, based on the VE's testimony, Plaintiff was unable to perform her past relevant work. With the burden shifting to the Commissioner, the ALJ determined that Plaintiff could work as a cashier, of which 4,000 such jobs existed in Missouri. He therefore concluded that there existed

a significant numbers of jobs in the national economy which Plaintiff could perform. Thus, the ALJ concluded that Plaintiff had not been disabled since July 9, 2002 and was not entitled to benefits. (Tr. 16)

## Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to her past relevant work; and (5) his impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the

evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[3] standards and whether the evidence so contradicts plaintiff's subjective

---

[3]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimant's functional restrictions. Polaski v. Heckler,

complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u> 49 F.3d at 1354.

## Discussion

Plaintiff alleges that the ALJ erred by failing to consider the effect of Plaintiff's pain medication on her ability to work; by failing to make an RFC finding based on substantial evidence; and by finding that Plaintiff's testimony was not credible. The Defendant, on the other hand, asserts that the ALJ properly performed a credibility analysis under <u>Polaski</u> and properly assessed Plaintiff's RFC. The undersigned agrees that substantial evidence supports the ALJ's determination and thus finds that the Commissioner's decision should be affirmed.

First, the ALJ properly assessed Plaintiff's credibility under the <u>Polaski</u> factors and determined that her allegations of disabling pain were not credible. The ALJ noted that Plaintiff's subjective complaints were not supported by the objective medical evidence contained in the record. For instance, while an MRI and examinations revealed some degenerative changes, some diminished sensation, tenderness, and limitation of motion, the medical evidence also demonstrated improvement of these symptoms, along with several "normal" examinations. Further, the ALJ properly discredited the report of Dr. Myers, wherein he opined that plaintiff was restricted in her ability to continuously sit or stand during a workday and that she needed to assume a reclining and supine position several times daily. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and

739 F.2d 1320, 1322 (8th Cir. 1984).

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted). In doing so, the ALJ must give good reasons. Id.

The ALJ noted that Dr. Myers' treatment notes did not support the limitations set forth by Dr. Myers in the Medical Source Statement. Indeed, Dr. Myers' treatment notes indicated only that he refilled Plaintiff's prescriptions and contained no objective evidence resulting from any examinations. Any reference to Plaintiff's condition appeared to be solely based on her subjective complaints and not on any objective data. Further, when asked to "[b]riefly describe the principal clinical and laboratory findings and symptoms or allegations (including pain) form which the impairment-related capacities and limitations . . . were concluded[,]" Dr. Myers stated only that Plaintiff had degenerative disc disease of the C-spine. (Tr. 145) In addition, the ALJ noted that Dr. Myers' conclusions were internally inconsistent, as Dr. Myers opined that Plaintiff could frequently (1/3 to 2/3 during a typical 8 hour workday) lift or carry five pounds but that she could only sit, stand, and walk a total of 3 hours, thus requiring Plaintiff to lift from a reclining or supine position. (Tr. 15, 145)

Further, no other treating or examining physician found that plaintiff was restricted to that degree. Dr. Kharidi discontinued treating Plaintiff in October, 2002, noting her improvement. (Tr. 159-160) Plaintiff was released from physical therapy in August, 2002, after meeting her goal to decrease pain to 2-3/10. (Tr. 177, 187) Dr. Brenner, whose opinion the ALJ did discuss and

17

consider,[4] noted that, while testing did not indicate a tendency to exaggerate symptoms, personality testing also suggested that Plaintiff's physical complaints were in excess of those typically seen in medically ill individuals.  In addition, she reported that Plaintiff was able to sit through a lengthy evaluation with no evidence of discomfort.  (Tr. 135-136) Dr. Brenner opined that, from a psychological perspective, plaintiff had no work restrictions or limitations.  (Tr. 136)

Further, Dr. Enkvetchakul concluded that Plaintiff was capable of work-related activity after a detailed and thorough physical examination.  (Tr. 151-158) While the opinion of a consulting physician who examined Plaintiff only once does not generally constitute substantial evidence, the ALJ may properly favor the consulting physician's report where it is more detailed and thorough. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000) (citations omitted).  In short, the record shows that Dr. Myers' Medical Source Statement was inconsistent with the assessments of Dr. Kharidi, Dr. Enkvetchakul, and Dr. Myers' own reports.  Therefore, the ALJ did not err in discounting Dr. Myers' opinion regarding plaintiff's capacity for work-related activity.

The ALJ also relied on the fact that plaintiff's daily activities were inconsistent with her allegations of total disability.  At the hearing, plaintiff testified that she cooked, hand-washed the dishes, did the laundry, and occasionally went grocery shopping.  In addition, Plaintiff reported to Dr. Brenner that she spent her days doing light housework, watching TV, reading, and talking to friends.  These activities are inconsistent with her allegations of disabling pain.  Gwanthey v. Chater, 104 F.3d

---

[4] Plaintiff argues that the ALJ failed to mention the fact that Dr. Brenner conducted a Personality Test which supported Plaintiff's complaints.  However, the record shows that the ALJ did mention Dr. Brenner's opinion, indicating that he considered the evidence.  (Tr. 13, 15-16) See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (ALJ is not required to discuss every piece of evidence, and failure to cite specific evidence is not an indication that the ALJ failed to consider it).

1043, 1045 (8th Cir. 1997) (holding that Plaintiff's ability to perform housework among other activities precluded a finding of disability). While these activities alone may not constitute substantial evidence that plaintiff is not disabled, the activities in conjunction with the lack of supporting medical evidence may be used to discredit plaintiff's subjective complaints. Kelley v. Callahan, 133 F.3d 583, 588-89 (8th Cir. 1998). Further, while Plaintiff suggests that the ALJ relied solely on the fact that Plaintiff occasionally went grocery shopping, the record demonstrates that the ALJ based his opinion on Plaintiff's testimony that she grocery shopped, "among other things." (Tr. 15) Thus, the record shows that the ALJ considered all of Plaintiff's daily activities to find her allegations of disability not credible.

The Plaintiff also argues that the ALJ erroneously failed to consider the side effects from Plaintiff's prescription medication as required by Polaski. However, the ALJ specifically stated in his decision that he considered Plaintiff's limitations in light of Polaski. (Tr. 13-14) "The ALJ was not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [Plaintiff's] subjective complaints." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citation omitted). The ALJ properly referred to Polaski, adequately explained his reasons for discrediting Plaintiff's subjective complaints, and supported his findings with evidence in the record. Id. Further, while Plaintiff testified that the medication caused her to lie down three to four times daily, the evidence in the record belies this allegation. Plaintiff reported stomach pain and upset, not drowsiness. (Tr. 164, 175) Further, while Plaintiff reported to Dr. Brenner that her medications made her tired and affected her concentration, she also reported that she retained adequate energy and enjoyed a number of regular activities. (Tr. 134) This evidence in the record weighs against Plaintiff's subjective allegations that she was unable to work due to side

effects from medication.[5]  In short, because the ALJ articulated and relied upon inconsistencies in the record to discredit Plaintiff's subjective complaints of pain, his credibility findings are supported by the record as a whole and should be affirmed.  Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).

Finally, with regard to plaintiff's contention that the ALJ improperly determined that plaintiff had the RFC to perform work that was available in significant numbers in the national economy, the undersigned finds that substantial evidence supports the ALJ's decision.  The ALJ relied on vocational testimony to find that plaintiff could work as a cashier, which job existed in significant numbers in both the state and national economies.  The Plaintiff argues, however, that the ALJ improperly relied on the consultative examination by Dr. Enkvetchakal instead of the RFC assessment proffered by Dr. Myers.  As previously stated above, the ALJ properly discredited the opinion of Dr. Myers because he failed to support it with "medically acceptable clinical and laboratory diagnostic techniques" and because it was "inconsistent with the other substantial evidence in the record."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).  Dr. Enkvetchakal's opinion, on the other hand, while the result of a consultative exam, was based on a detailed and thorough examination of Plaintiff and was consistent with other medical evidence in the record.  See Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000) (citations omitted). Therefore, the undersigned finds that the ALJ's

---

[5]  The undersigned notes that the case which Plaintiff relies on, Bowman v. Barnhart, 310 F.3d 1080 (8th Cir. 2002), is inapposite.  While the Eighth Circuit Court of Appeals found that the ALJ failed to develop the evidence regarding the side effects from Oxycontin and antidepressants, the Court also based is decision to reverse and remand on the fact that the ALJ did not contact the plaintiff's treating physician of thirty years and instead relied on the report of a non-examining consultant.  Id. at 1084-1085.  Such is not the case here, where the ALJ adequately addressed the record as a whole.

RFC determination was based on substantial evidence based on the record as whole.  Thus, the decision of the Commissioner should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of August, 2005.